|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,  Plaintiff, v. PHILLIP HUDNALL, TODD ESH, BIRDDOG BUSINESS GROUP, LLC, and BIRDDOG OIL EQUIPMENT, LLC,  Defendants, DUC "DOUG" NGUYEN, BRIAN HUDNALL, DONDON, LLC, KANSAS OIL RESERVES, LLC, KANSAS OIL RESERVES 2, LLC, and PHARYN RESOURCES, LLC,  Relief Defendants. | Civil Action No. 20-cv-327  JURY TRIAL REQUESTED |

# COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission") alleges as follows:

1. This matter involves a fraudulent securities offering orchestrated by Phillip Hudnall ("Phil Hudnall") – with help from Todd Esh ("Esh") – operating through BirdDog Business, LLC and BirdDog Oil Equipment, LLC, ("collectively BirdDog"), two entities that Hudnall and Esh founded and controlled.

2. Between February and at least June 2019, Phil Hudnall and Esh raised more than $3.6 million by selling promissory notes issued by BirdDog to investors. Defendants promised that they would use investor funds to buy and refurbish used oil and gas

equipment which BirdDog would then resell at a profit (the "Equipment Transactions"). Instead, Phil Hudnall misappropriated most of investors' money and squandered the rest on a bogus equipment deal.

3. To stoke investor interest, Defendants promised that the notes would pay a 30% return after just nine months. Defendants also emphasized the safety of the investment, promising investors that their principal would be secured by a "first priority security interest" in specific oil and gas equipment.

4. Critically, Phil Hudnall and BirdDog assured investors that they had done this sort of transaction before. In offering materials provided to prospective investors, they highlighted two purportedly profitable Equipment Transactions that they had already completed. They represented that each transaction had taken less than 6 months and generated a 30% return – the same return promised to investors. They suggested in BirdDog's term sheet that other transactions had taken place, telling investors, among other things, that Hudnall had "tested the concept" of the Equipment Transactions, and had "discovered that the concept was profitable."

5. Unfortunately, Phil Hudnall's representations regarding his previous deals were lies. And, the two "completed transactions" described in BirdDog's term sheet were fake. In reality, BirdDog had never completed a resale of refurbished equipment, let alone resold such equipment for a profit.

6. In addition to misrepresenting their experience, Defendants were not using investor funds as promised. Rather than using the funds raised from investors to buy and refurbish oil and gas equipment, Phil Hudnall commingled investor principal with a bank loan and funds from investors in earlier, unrelated offerings. He then (a) secretly diverted those funds to buy $1.7 million of land in Colorado; (b) made nearly $900,000 in Ponzi-type

2

Case 4:20-cv-00327-BCW   Document 1   Filed 04/23/20   Page 2 of 20

payments to investors in other securities offerings that he orchestrated; and (c) paid himself over $465,000 to support his lavish lifestyle including the purchase of a $99,000 luxury SUV.

7. In the course of misappropriating investor funds, Phil Hudnall depleted BirdDog's assets through a series of complex transfers through a group of entities controlled by himself and his brother, Relief Defendant Brian Hudnall. By the end of that web of transfers, the Hudnalls' entities – Relief Defendants DonDon, LLC ("DonDon"), Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, and Pharyn Resources, LLC – held almost $250,000 of investor cash to which they were not entitled. Meanwhile, Relief Defendant Brian Hudnall was paid $48,585 that he and his brother had funneled through DonDon.

8. Defendants made only one attempt at investing BirdDog's funds as promised. That isolated effort was a spectacular failure. Between February 26, 2019 and June 17, 2019, Phil Hudnall transferred nearly $1.2 million – composed mostly of BirdDog investor funds – to Relief Defendant Duc "Doug" Nguyen ("Nguyen"), ostensibly to buy and refurbish oil and gas equipment. But, instead of buying equipment, Nguyen took all of the funds for himself. He paid most of the money to a group of Las Vegas casinos, sent approximately $85,000 to friends and family, and – like Phil Hudnall – used investor cash to pay for a new car.

9. While Phil Hudnall and Nguyen enjoyed the money they pilfered, investors lost almost everything. No equipment was ever delivered to – or refurbished by – BirdDog. The purported "first priority security interest" conveyed to investors was an illusion; BirdDog never had any equipment to pledge as collateral. And, at the end of Phil Hudnall's fraudulent scheme, Bird Dog was left with less than $500 in its bank account.

10. By engaging in the conduct described in this Complaint, Defendants Phil Hudnall, Esh, BirdDog Business, LLC, and BirdDog Oil Equipment, LLC have engaged

and – if not enjoined – will continue to engage in transactions, acts and practices, and courses of business that violate the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa]. Defendants Phil Hudnall, Esh, and BirdDog, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices and courses of business alleged in this Complaint.

12. Venue is proper in this Court pursuant to Securities Act Section 22 [15 U.S.C. § 77v] and Exchange Act Section 27 [15 U.S.C. § 78aa] because many of the acts, transactions, practices, and courses of business constituting the violations alleged in this Complaint occurred within this district. For example, the majority of Defendants' illicit transfers were funneled through a bank account in Liberty, Missouri. In addition, Relief Defendant Brian Hudnall resided and transacted business within this district.

## DEFENDANTS

13. <u>Phillip Hudnall</u> is 49 years old and resides in Lenexa, Kansas. In February 2019, he and Esh formed BirdDog Oil Equipment, LLC and BirdDog Business Group, LLC to raise investor funds for the purported purchase and sale of refurbished oil and gas

4

equipment. He also founded and controls at least four other entities: Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, Pharyn Resources, Inc., and Pharyn Resources, LLC.

14. <u>Todd Esh</u> is 48 and resides in Lenexa, Kansas. He and Phil Hudnall formed BirdDog Oil Equipment, LLC and BirdDog Business Group, LLC in February 2019. From 1997 until July 2019, Esh worked as a registered representative and investment adviser representative for a large broker-dealer and investment adviser.

15. <u>BirdDog Business Group, LLC</u> was formed in Kansas by Phil Hudnall and Todd Esh on February 25, 2019 to raise investor funds for the purported purchase and sale of refurbished oil and gas equipment.

16. <u>BirdDog Oil Equipment, LLC</u> was formed in Kansas by Phil Hudnall and Todd Esh on February 25, 2019. Hudnall and Esh deposited some BirdDog investor funds in a bank account opened in the name of BirdDog Oil Equipment.

## RELIEF DEFENDANTS

17. <u>Duc "Doug" Nguyen</u> is 56 years old and resides in Houston, Texas. He received almost $1.2 million from BirdDog – the vast majority of which came from investors – to which he was not entitled.

18. <u>Brian Hudnall</u> is 42 years old and he resides in Kansas City, Missouri. He received at least $48,585 in BirdDog investor funds to which he was not entitled. Brian Hudnall controls DonDon, LLC, which he and two other individuals formed as a Texas limited liability company in April 2018. Most of the funds raised from investors in connection with the BirdDog offering were initially transferred to DonDon's bank account which was under Brian Hudnall's control. In January 2017, the Commission charged Brian Hudnall and an entity under his control with violating the registration and antifraud provisions of federal securities law in connection with an unrelated oil and gas offering. In

that case, a consent judgment was entered against Brian Hudnall which, among other relief, required him to pay disgorgement plus prejudgment interest totaling $11,920,440 and $160,000 in civil penalties.

19. <u>DonDon, LLC</u> was formed in Texas in April 2018 by Brian Hudnall and two other individuals. DonDon has at least one account controlled by Brian Hudnall at a bank located in Liberty, Missouri.

20. <u>Kansas Oil Reserves, LLC</u> was formed in Kansas on June 1, 2017 by Phil Hudnall. Phil Hudnall diverted some investor funds from the BirdDog offering to the bank account of Kansas Oil Reserves, LLC.

21. <u>Kansas Oil Reserves 2, LLC</u> was formed in Kansas on August 26, 2018 by Phil Hudnall. Phil Hudnall instructed the first investor in the BirdDog offering to deposit her money into the Kansas Oil Reserve 2 bank account, and funds of other investors were subsequently transferred to that account. On May 1, 2019, the company bought land in Colorado using BirdDog investor funds.

22. <u>Pharyn Resources, LLC</u> was formed in Kansas on July 17, 2008 by Phil Hudnall, who raised funds from investors through it for certain oil and gas offerings unrelated to the BirdDog offering. Some BirdDog investor funds were transferred to the bank account of Pharyn Resources, LLC.

## FACTS

### The BirdDog Securities Offering

23. In February 2019, Phil Hudnall and Todd Esh co-founded BirdDog Oil Equipment, LLC and BirdDog Business Group, LLC (collectively, "BirdDog") to raise funds from investors for the purported purchase and sale of refurbished oil and gas

equipment. BirdDog was a two man operation. It had no offices, and no employees or officers other than Phil Hudnall and Esh.

24. Starting in February 2019 – and continuing until at least June 2019 – Phil Hudnall and Esh convinced at least twelve investors located in five states to invest $3,650,361 in promissory notes issued by BirdDog.

25. Each of the BirdDog notes – drafted by Phil Hudnall and Esh – provided for a 30% return to the investor over the nine-month term of the note.

26. Each note was accompanied by a Security Agreement – also drafted by Phil Hudnall and Esh – which represented that the noteholder's interest would be secured by specific, identified oil and gas equipment (defined as the "Secured Property"). The Security Agreement represented that BirdDog granted the noteholder a "first priority lien and security interest" in the Secured Property, that the noteholder could direct BirdDog to "immediately take all actions to…perfect the security interest," and that "the pledge of the Secured Property pursuant to this agreement creates a valid and perfected first priority security interest."

27. The promissory notes Bird Dog sold to investors are "securities" as defined in Section 2(a)(1) of the Securities Act.

28. At the time of the Bird Dog securities offering, Esh worked as a registered representative and investment adviser representative at a registered broker-dealer and investment adviser. As of July 2019, Esh had 22 years of experience in the securities industry. Esh did not sell the BirdDog notes through his broker-dealer employer or notify his broker-dealer employer about the offering.

29. As part of their solicitation efforts, Defendants communicated with prospective investors by email, telephone calls, and through in-person presentations to potential investors.

30. To market the BirdDog notes, Phil Hudnall and Esh together created a term sheet that they provided to prospective investors between February 2019 and at least June 2019 (the "Term Sheet"). Phil Hudnall and Esh were ultimately responsible for the content of the Term Sheet and distributed it to prospective investors.

31. The Term Sheet represented that BirdDog would use investor funds to (a) buy used oil and gas equipment from a well-known oil company, (b) "refurbish and recertify" the equipment, and (c) resell the equipment to an "end buyer" which was willing to buy "at least $1-3 million of equipment every month."

32. The Term Sheet reiterated that investors would receive 30% interest over nine months, and that some Equipment Transactions would likely generate profits even faster than that.

33. The Term Sheet also represented that:

    (a) More than $85 million in used oil equipment – from "a large oil company" – was available for BirdDog to purchase;

    (b) BirdDog did not buy equipment unless there was an "end-buyer" committed to buying the refurbished equipment from BirdDog; and

    (c) The equipment that BirdDog acquires is "the most popular oil and gas equipment that is necessary on every drill-site, such as mud pumps, top drives, power swivels, blow out preventers and drill pipe."

34. The Term Sheet and promissory notes did not have any provision allowing for the payment of compensation to Phil Hudnall or Esh out of investor principal. And, no language in the Term Sheet or promissory notes authorized Phil Hudnall or Esh to pay themselves "advanced profits" out of investor principal.

35. In the portions of the Term Sheet which he drafted, Phil Hudnall assured investors that he had experience in completing profitable Equipment Transactions of this type. The Term Sheet assured investors that Phil Hudnall had "tested the concept" of buying and reselling equipment, and had "discovered that the concept was profitable." Phil Hudnall and BirdDog highlighted two purportedly profitable Equipment Transactions that they had completed. The Term Sheet represented that the two previous transactions each took less than 6 months to complete and each generated a 30% return.

36. Defendants also indicated elsewhere in the Term Sheet that BirdDog had successfully completed prior Equipment Transactions. For example, the Term Sheet (a) represented that "no deal has exceeded the six-month time period," (b) identified the "usual" timeframe for refurbishment, and (c) assured investors that no end-buyer had ever "back[ed] out" of buying refurbished equipment from BirdDog.

37. In addition to the BirdDog notes and the Term Sheet, Phil Hudnall and Esh created a PowerPoint presentation that Phil Hudnall provided to certain prospective investors during in-person meetings (the "BirdDog PowerPoint"). Phil Hudnall was ultimately responsible for the contents of the BirdDog Powerpoint.

38. In the BirdDog PowerPoint, Defendants repeated many of the statements in the Term Sheet identified in ¶¶ 31-35 above. The PowerPoint reiterated that (a) BirdDog generated returns by "buying unrefurbished equipment from our supplier, shipping to a refurbishment company…and then finally, to the end purchaser, all within a six month timeframe"; and (b) "money raised will be used to fund the purchase and refurbishing of used Oil and Gas Equipment." As in the Term Sheet, Phil Hudnall suggested in the PowerPoint that he had successfully completed other Equipment Transactions, claiming that the "average time" for BirdDog's transactions "is usually 90-120 days."

39. The representations identified in the Security Agreement (¶ 26 above), Term Sheet (¶¶ 31-36 above), and PowerPoint (¶ 38 above) were false when made. In reality:

   (a) BirdDog had not completed any prior Equipment Transactions (much less completed one at a 30% profit) at the time the Term Sheet was distributed;

   (b) The two example Equipment Transactions cited in the Term Sheet were fake;

   (c) BirdDog did not have the ability to buy or refurbish used equipment as claimed, nor did BirdDog have any "end-buyers" committed to purchase refurbished equipment from it;

   (d) Rather than investing the money as promised – and as described in detail in ¶¶ 43-48 below – Phil Hudnall was diverting a large portion of investor principal to pay his personal expenses and to buy real estate; and

   (e) BirdDog never took delivery of any of the equipment identified in the Security Agreements, did not have a valid "first priority lien" to convey to investors, and had taken no steps to perfect any security interest on behalf of investors.

40. The misrepresentations identified in ¶¶ 26, 31-36, and 38 were material. They involved core aspects of the investment: the nature of the transactions that would generate returns, the existence of collateral, the use of funds, and the relevant experience of those overseeing the investment. Reasonable investors making investment decisions would find it important – as part of the total mix of information available – that their principal was not being invested as promised, their funds were being diverted to pay Phil Hudnall's personal expenses, Phil Hudnall had no experience in completing profitable Equipment Transactions, and the pledged collateral did not exist.

41. Defendant Phil Hudnall acted with scienter. At the time he made the representations identified in ¶¶ 26, 31-36, and 38, Phil Hudnall knew that (a) BirdDog had not entered into any Equipment Transactions prior to the offering, (b) the two successful transactions discussed in the BirdDog term sheet were fake, (c) he had no experience with

10

completing the type of Equipment Transactions described in the Term Sheet, (d) BirdDog had never taken delivery of (or title to) any equipment that it was pledging as collateral, and (e) Hudnall was diverting a significant portion of investor cash to pay personal expenses and to buy real estate.

42. Defendant Esh also acted with scienter. He acted with extreme recklessness in disregarding that BirdDog – a company he helped form – had not completed the two example Equipment Transactions discussed in the BirdDog Term Sheet. Despite his long career working in the securities industry, Esh did not take meaningful steps to verify the representations in the Term Sheet (including representations regarding the two example Equipment Transactions). Despite acting as the self-proclaimed bookkeeper for BirdDog, Esh failed to take meaningful steps to ensure that BirdDog funds were deployed as promised to investors. Esh also knew that BirdDog funds were initially transferred to a bank account associated with DonDon, which was controlled by Brian Hudnall. Brian Hudnall had previously been charged with securities fraud, and entered into a consent judgment requiring to pay over $12 million in monetary relief in a 2017 SEC enforcement action related to a previous oil and gas offering. Despite this knowledge, Esh did not take steps to verify that BirdDog investor funds were used to purchase and refurbish used oil equipment.

### Phil Hudnall's Misappropriation of BirdDog Investor Funds

43. Instead of using investor funds to buy and to refurbish equipment as promised to investors, Phil Hudnall commingled almost $3.2 million of BirdDog investor funds with a bank loan (as described in ¶¶ 51-57 below), and with funds obtained from investors in unrelated offerings that Phil Hudnall had orchestrated.

44. Then, Phil Hudnall transferred the overwhelming majority of investor principal to an account in the name of Relief Defendant DonDon (controlled by Phil

Hudnall's brother, Relief Defendant Brian Hudnall). Brian Hudnall skimmed a portion of the amounts Phil Hudnall transferred to DonDon. In total, Brian Hudnall was paid $48,585 out of BirdDog's account – an account mostly composed of investor funds – to which he was not entitled.

45. From there, in a series of complex transfers, Phil Hudnall (with Brian Hudnall's help) sent investor funds out of the DonDon account and funneled them through a group of entities that he controlled – Relief Defendants Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, and Pharyn Resources, LLC. From those accounts (and from the remaining funds in BirdDog's account), Phil Hudnall misappropriated investor funds to make unauthorized payments to himself and others.

46. For example, on May 1, 2019, Phil Hudnall used $1.7 million – including comingled investor funds – to buy 79 acres of land in Colorado. He did not have authorization from BirdDog investors for this purchase. Phil Hudnall never told investors that – rather than investing in oil and gas equipment as promised – he had diverted a substantial portion of their investment to buy real estate.

47. Phil Hudnall also used BirdDog investor funds to make nearly $900,000 in Ponzi-type payments to investors in prior, unrelated investment offerings that Phil Hudnall had orchestrated.

48. Phil Hudnall also paid himself $24,000 in "advanced profits" out of the BirdDog account, and took over $450,000 of investor funds to pay personal expenses. For example, Hudnall used investor funds to (a) buy himself a $99,000 BMW X7 luxury sport utility vehicle in May 2019, and (b) buy over $24,000 of tickets for local sporting events. Phil Hudnall's misuse of funds was not authorized by – and was never disclosed to – BirdDog investors.

49. Esh also was paid unauthorized "advanced profits" of $24,000, which was not disclosed to, or authorized by, BirdDog investors.

50. As of June 28, 2019, Relief Defendants Don Don, Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, and Pharyn Resources, LLC held almost $250,000 – the vast majority of which consisted of investor funds – to which they were not entitled. Specifically, as of that date, those Relief Defendants held at least the following investor funds:

| RELIEF DEFENDANT | AMOUNT HELD AS OF 6/28/2019 |
| --- | --- |
| Don Don | $64,525.32 |
| Kansas Oil Reserves, LLC | $1,860.74 |
| Kansas Oil Reserves 2, LLC | $171,283.22 |
| Pharyn Resources, LLC | $8,952.02 |
| **TOTAL** | **$246,621.30** |

**Phil Hudnall Repays Certain Investors By Fraudulently Procuring a Bank Loan**

51. By June of 2019, Phil Hudnall's fraudulent offering was beginning to unravel. BirdDog had not obtained – let alone refurbished – any equipment for resale, and some investors were beginning to demand their money back.

52. At that point, Phil Hudnall could have come clean and admitted to investors that their funds had not been used as represented and that the promised 30% returns were illusory. Instead, Phil Hudnall decided to perpetuate his fraudulent scheme by using proceeds from a bank loan to pay off certain BirdDog investors whose notes were coming due.

53. Phil Hudnall and Esh already had access to an installment loan that they originally had taken in April 2019 from a bank in Pittsburgh, Pennsylvania. In June 2019, Phil Hudnall and Esh requested an additional installment on that loan. They told the bank that the loan proceeds would be used to co-invest in BirdDog and fund more Equipment Transactions. In reality, Defendants used the majority of the proceeds to pay off a select few BirdDog investors.

54. Before loaning the money, the Pittsburgh bank requested verification that BirdDog had agreements in place to sell its refurbished equipment.

55. Instead of telling the bank the truth – that BirdDog lacked any actual agreements to sell refurbished oil and gas equipment – Phil Hudnall directed Esh to create a phony purchase order from a large oil and gas equipment company stating its commitment to buy $1,084,616 in equipment from BirdDog. At the time he directed Esh to create it, Phil Hudnall knew that the transactions reflected in the purchase order were fake.

56. The Pittsburgh bank relied on Phil Hudnall's fake purchase order in making its decision to loan Phil Hudnall and Esh an additional $554,673 for the purpose of buying additional oil and gas equipment for refurbishment and resale.

57. Phil Hudnall transferred the loan proceeds to the BirdDog account, comingling the $554,673 with investor funds. Phil Hudnall and Esh then paid themselves the advanced profits identified in ¶¶ 48-49 above, Phil Hudnall withdrew $4,000 cash, and BirdDog paid a $29,250 "finders fee" to a third party who helped recruit investors.

58. Then, instead of using the proceeds from the loan installment as represented, Esh – at Phil Hudnall's direction – transferred the remaining $473,000 of the loan proceeds to two BirdDog investors who were demanding their money back.

### BirdDog Transfers $1.2 Million to Relief Defendant Nguyen Who Steals the Funds

59. Defendants made only one attempt at using investor funds as promised. While Phil Hudnall took most of investors' money for himself, he transferred about a third of investors' principal to Relief Defendant Nguyen in an apparent attempt to complete an Equipment Transaction.

60. Between February 22, 2019 and June 17, 2019, Defendants transferred almost $1.2 million – mostly BirdDog investor funds– to Nguyen. Nguyen had told Phil Hudnall and Esh that he had procured oil and gas equipment from a major oil company and had an end-buyer lined up to buy the equipment once it could be refurbished.

61. Phil Hudnall and Esh took Nguyen's word for it. They did not independently verify Nguyen's experience or capabilities.

62. Nguyen's proposed Equipment Transaction was a sham. Rather than use the $1.2 million to buy the equipment, Nguyen simply took it for himself. He transferred most of the money – approximately $615,000 – to a group of Las Vegas casinos, paid over $85,000 to friends and family, and used at least $21,000 of investor cash for payments on a new car.

\* \* \* \* \*

63. In the wake of Phil Hudnall's misappropriation of assets and Nguyen's sham equipment offering, investors have been left with almost nothing. In the course of his fraud, Phil Hudnall stole or squandered over $4.5 million, including (a) almost $3.2 million of investor funds (the $3.6 million raised, minus the amounts paid back to investors from the fraudulently procured bank loan), and (b) the bank loan he used to keep his fraudulent scheme afloat. By June 28, 2019, BirdDog was left with no oil and gas equipment and only $478 in its bank account.

# COUNT ONE

**For Violations of Section 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. § 77q(a)(1), 77q(a)(2) and 77q(a)(3)]**
**(Against Phil Hudnall, Esh, and BirdDog)**

64. The Commission realleges and incorporates by reference paragraphs 1 through 58.

65. Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) employed devices, schemes and artifices to defraud; (b) obtained money and property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

66. Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC acted knowingly, or with extreme recklessness, in engaging in the fraudulent conduct described above.

67. Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC also acted negligently in engaging in the fraudulent conduct described above.

68. By engaging in the conduct described above, Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

# COUNT TWO

## Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]
### (Against Phil Hudnall, Esh, and BirdDog)

69. The Commission realleges and incorporates by reference paragraphs 1 through 58.

70. Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly: (a) used and employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

71. Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC acted knowingly or with extreme recklessness in engaging in the fraudulent conduct described above.

72. By engaging in the conduct described above, Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT THREE

### Equitable Disgorgement
**(Against Relief Defendants Brian Hudnall, Duc "Doug" Nguyen, DonDon, Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, and Pharyn Resources, LLC)**

73. The Commission re-alleges and incorporates paragraphs 1 through 63 by reference as though fully set forth herein.

74. As a result of the conduct described in paragraphs 1 through 64 above, Relief Defendants Brian Hudnall, Nguyen, DonDon, Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, and Pharyn Resources, LLC received funds from BirdDog investors as a result of the violations of the securities laws by Phil Hudnall, Esh, and BirdDog.

75. Relief Defendants Brian Hudnall, Nguyen, DonDon, Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, and Pharyn Resources, LLC have no legitimate claim to the funds they received.

76. Relief Defendants Brian Hudnall, Nguyen, DonDon, Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, and Pharyn Resources, LLC should be required to disgorge all ill-gotten gains which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment, and constructive trust.

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Permanently enjoin Defendants Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC from, directly or indirectly, violating or aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Order Defendants Phil Hudnall, Esh, BirdDog Business, LLC and BirdDog Oil Equipment, LLC and Relief Defendants Duc "Doug" Nguyen, Brian Hudnall, DonDon, LLC, Kansas Oil Reserves, LLC, Kansas Oil Reserves 2, LLC, and Pharyn Resources, LLC to disgorge all ill-gotten gains they received as a result of the violations alleged in this Complaint, and order them to pay prejudgment interest thereon;

**III.**

Order Defendants Phil Hudnall and Esh to pay civil penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21 of the Exchange Act [15 U.S.C. § 78u];

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable applications or motions for additional relief within the Court's jurisdiction;

**V.**

Grant such other and further relief as the Court deems necessary and appropriate.

# JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury on all issues so triable.

Dated: April 23, 2020

Respectfully Submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

/s/ *Timothy S. Leiman*

Timothy S. Leiman (LeimanT@sec.gov)
Brian Fagel (FagelB@sec.gov)
Richard G. Stoltz (StoltzR@sec.gov)

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)